No. 33,803

WILLIAM F. NICCUM, *Appellee*, v. THE ATCHISON, TOPEKA & SANTA
FE RAILWAY COMPANY, *Appellant*.

(78 P. 2d 1)

Opinion filed April 9, 1938.

*Bruce Hurd, C. J. Putt* and *Robert M. Clark,* all of Topeka, for the appellant.

*Charles Rooney* and *Randal C. Harvey,* both of Topeka, for the appellee.

The opinion of the court was delivered by

HUTCHISON, J.: This was an action by a landowner to recover for loss and damage to crops, orchard and permanent injury to land by a railway company in first constructing an embankment on its right of way about three feet above the natural elevation, which accumulated large quantities of floodwater from the Kansas river during a flood and overflow of water from the river in the months of May and June, 1935; and later, after such accumulation and when the high water in the river was receding, but the overflow waters therefrom remained in large quantity along the north edge of the defendant's right of way, the defendant caused to be cut underneath the tracks of the railway three drains or culverts, thereby causing the "accumulated floodwaters" to be discharged with great force and violence upon plaintiff's land lying south of defendant's right of way, the river being about a half a mile north of the right of way, which discharge of accumulated waters washed away a substantial part of the top soil and deposited sand and silt, thereby damaging plaintiff's crops, orchard and land in the sum of $900, as alleged in the petition.

The defendant railway company filed a demurrer to this petition on the ground that it did not state a cause of action. The court overruled the demurrer, and from that ruling the defendant railway company appeals. The plaintiff had, in the meantime, with the consent of the trial court, amended his petition by inserting paragraph 9 which alleged negligence on the part of the defendant company in that it failed to release the water into a creek on the north side of the right of way with the same labor as was required to cut the three drains under the track, and avoid injury to the plaintiff. This amendment, however, was not filed until after two years from the date of the alleged injury to the land and crops of the plaintiff, and the defendant filed a motion to strike said paragraph from the pleading as irrelevant and in variance with the rest of the petition. The court sustained the motion to strike, and the plaintiff is here with a cross-appeal to review that ruling.

As to the ruling upon the demurrer, much is said and many decisions are cited where floodwater becomes surface water and a different rule applies. So we must decide in the first place in this case whether the allegations refer to floodwater or surface water. Surface water is mentioned twice in the petition, once in paragraph 5 and again in paragraph 6. In paragraph 5 it alleged that prior to the construction of the railway and the elevation of its track there was a natural drainage of surface water from the right of way and the land north thereof toward and upon the plaintiff's land, but that such drainage was gradual and not in such volume or intensity as to injure plaintiff's land. In paragraph 6 it is stated that prior to June 10, 1935, when the culverts were put under the track, the surface water from the north was retarded by the elevation of the defendant's tracks. All the rest of the allegations of the petition concerned the floodwater and overflow from the Kansas river and the receding thereof before the insertion of the culverts or drains through which the accumulated floodwater was discharged with great force.

The case of *Thompson v. McDougal,* 103 Kan. 373, 175 Pac. 157, was concerning a break in the natural bank of a river which injured some of the landowners, who built a levee on their own land that turned the water back onto the land where the broken bank was, and the court held that it concerned floodwater and not ordinary surface water, referring to the decision in the case of *Manufacturing Co. v. Bridge Co.,* 81 Kan. 616, 106 Pac. 1034, where it was held:

"The duty of the builder of a bridge over a watercourse to avoid ob-

structing it does not end with making provision for the escape of so much water as can be carried within the channel; if there is reason to anticipate that the stream will at times overflow its banks he must also, if practicable, provide an outlet for the floodwater." (Syl. ¶ 3.)

In the opinion the following statement from 25 L. R. A. 530 was copied with approval:

" 'To make the rights with reference to floodwater of a river depend upon whether or not it is surface water is useless. The only safe course is to treat floodwater as a class by itself and then determine the respective rights according to the character of the flood.' " (p. 622.)

In the same case the following quotation is made with approval from *Railway Co. v. Herman*, 74 Kan. 77, 81:

" 'There is a suggestion that the overflow of the stream is to be treated as surface water, and that the company cannot be held liable for injury resulting from such water. If the water was thrown back upon the riparian owners because of the obstruction of the channel of the stream, it is immaterial by what name it is designated.' " (p. 622.)

This refers to the throwing of the floodwater back upon the landowner up the stream. That is what any embankment would naturally do, and it would be to avoid doing so and also to protect the defendant's track that it would make drains or culverts in the embankment. The first paragraph of the syllabus in this Herman case is as follows:

"If a railroad company in building a bridge across a stream fails to leave ample passageway for such a flow of water in the stream as might reasonably be anticipated, and the bridge dams the water back upon the riparian owner to his injury, the railroad company is liable for the resulting loss."

Much has been said in the briefs about floodwater becoming surface water when the peak of the flood is over and the water recedes and forms into pools or ponds of stagnant water, but we think the petition does not present such a situation. Of course, there will be pools the moment the recession begins unless the land is all sloping toward the river or is practically level. The petition does not state facts to put it in this class within five days after the peak of the flood was reached. It is said in 67 C. J. 863:

"Overflow or floodwaters of a river, stream, or natural watercourse become surface water when they leave the main current never to return and spread out over lower ground; but if they form a continuous body with the water flowing in the ordinary channel, the current widening to the full width of the water, or if they depart from the stream presently to return or to run into another stream or lake, it has been held that they are to be regarded as a part of the stream and not as surface waters."

Under these authorities and the allegations of the petition we shall regard the water described in the petition as floodwater.

We shall now consider the liability of the defendant who built an embankment which obstructed the continuous flow of floodwater and caused it to be collected at the embankment which had no culverts or drains through which it could pass, and who later made such culverts or drains that let the assembled water through with a rush to the injury of the crops and land on the other side of the embankment. In most cases the injury by an embankment retarding the flow or spreading out of the floodwater is sustained by those landowners upstream on account of the water unnaturally backing up on their lands for a longer time and to a greater extent than it otherwise would have done. Generally speaking, any such embankment, unless it has reasonable openings in it for flood purposes, is the basis of a liability to those injured thereby. Here we have an embankment without culverts at first. This might have been a cause of liability for those on the north or river side of the embankment but not for the plaintiff or others on the south side. But we later have the installing of culverts according to the allegations of the petition during the receding of the flood, which let the floodwater through with a rush. Of course, the defendant had a right, and perhaps a duty, to install such drains or culverts, but was there a liability in constructing them at a time when the accumulated floodwater would go through with a damaging rush? We shall consider both matters together.

The case of *Clements v. Phoenix Utility Co.*, 119 Kan. 190, 237 Pac. 1062, was where floodwater injured parties on the river side of the embankment, which had culverts of sufficient capacity thereunder for surface water, but not for floodwater. The history of the changes made in rulings concerning the rights and liabilities of parties under such circumstances is instructive and has been helpful in the application of such rules since that time. It was there held that—

"The owner of property on the bank of a watercourse has the right to build levees or other barriers to confine the water to the channel of the stream, but he cannot build and maintain a structure which will change the channel or project the water against or upon the property of another, either on the same side of the stream with him or the opposite side, in such a way as will result in substantial injury to such property, without liability therefor." (Syl. ¶ 2.)

Under this situation it was said in the closing part of the opinion that the party building the embankment should be held liable because on account of the embankment the plaintiff's land was covered with water over a larger area and to a greater depth than it would otherwise have been.

It was held in *Riddle v. Railway Co.*, 88 Kan. 248, 128 Pac. 195, that—

"A railroad company in carrying its railroad over a watercourse and the approaches thereto must provide sufficient outlets not only for the ordinary flow of water, but also for the escape of water in times of floods which may reasonably be expected to occur." (Syl. ¶ 1.)

The very recent case of *Foster v. Kansas Gas & Elec. Co.*, 146 Kan. 284, 69 P. 2d 729, was where a gas and electric company with very large and expensive building and equipment, located on the east side of the Neosho river, constructed an embankment five to seven feet above the general level of the land from the east bank of the river quite a distance to protect its works from the floodwaters of the river, and also constructed high banks north and south of a lake still farther east, the waters of which lake the company used. It left openings in the north and south banks of the lake and also between the lake and the bank north of the works, but it later filled such openings so that the embankment was continuous from the east bank of the river for nearly a mile. The plaintiff's land was about a quarter of a mile east of the end of the embankment which was north of the lake. The plaintiff in his action against the electric company complained of the extended embankment making the floodwater on his land deeper and staying longer than before the building of the embankment to his damage and injury, and it was held that—

"In an action for damages to crops by floodwaters of a stream alleged to have been diverted to plaintiff's land by a fill and levee constructed and maintained by defendant, the record is examined, and it is held: (1) that there is substantial, competent evidence to support the judgment for plaintiff, and (2) that the court did not err by applying the rules of law stated in the syllabus in *Clements v. Phoenix Utility Co.*, 119 Kan. 190, 237 Pac. 1062, with respect to liability of defendant." (Syl.)

In 3 Farnham on Waters and Water Rights, page 2564, it is said:

"Thus, where a violent rainfall had caused much water to collect against a railroad embankment, and the company, to protect the embankment, cut a passageway through and let the water run onto the land of a lower proprietor,

it was held liable in damages for the injuries done, on the ground that to relieve itself from injury it had no right to inflict it on others."

In 27 R. C. L. 1099 it is said:

"An upper riparian owner does not have the right suddenly to release water held back by an ice jam, to the injury of a lower owner, and the fact that such action is necessary to protect the land of the upper owner does not relieve him from liability. Even though the upper owner is a railroad company and its roadbed is endangered by the floodwaters retained by the jam, its liability is not relieved by the necessity, for while it may be conceded that it is the imperative duty of a railroad to protect its roadbed from injury or destruction, the necessity for action gives it no right to turn the water resting against it upon the proprietors below, to their injury. Dams, dikes, embankments, and the like may be constructed in or along floatable streams to facilitate their use, but not to the extent of injuring the riparian proprietors by retarding the flow of the water or sending it down in increased volume, to their injury."

We conclude that although the defendant railway company had a right to build an embankment to raise its track on its right of way and to construct culverts thereunder to permit floodwater to pass through onto the land of others, yet it is liable if it constructed such culverts at such a time as to cause the accumulated floodwater to be discharged through them with greater force and violence than as if sufficient drains had been already constructed when the flood commenced. The petition alleged the loss and damage was caused by the discharge of such accumulated floodwater through such newly constructed culverts upon the land of the plaintiff with great force and violence. The demurrer was properly overruled.

As to the sustaining of the motion of defendant to strike paragraph 9 of the amended petition, we also think the ruling was correct, because said paragraph was not added until more than two years after the time the injury was sustained, and the allegations thereof state a different cause of action in the nature of negligence in not diverting this accumulated floodwater through a creek on the north side of the right of way instead of through the three newly constructed culverts or drains. The rulings are both affirmed.

HARVEY, J., not sitting.